IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JEREMY SANCHEZ,

     Plaintiff,

vs.                                             Civ. No. 12-1122 KG/WPL

MICHAEL JIMENEZ, individually and in his official capacity as
The Administrator of the Grant County Detention Center,
JON SAARI, individually and in his official capacity as Grant County Manager
and as supervisor of Michael Jimenez,
THE BOARD OF COUNTY COMMISSIONERS
OF GRANT COUNTY, NEW MEXICO, in its official
Capacity and as the supervisor of Jon Saari and Michael Jimenez,

And

THE AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES LOCAL 2516,

And

THE AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES COUNCIL #18,

     Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment

(Motion for Summary Judgment), filed on August 27, 2013, by Defendants Michael Jimenez,

Jon Saari, and the Board of County Commissioners of Grant County, New Mexico (collectively,

the County Defendants).  (Doc. 44).  On November 1, 2013, Plaintiff filed an amended response

and a Fed. R. Civ. P. 56(d) affidavit requesting further discovery to oppose the Motion for

Summary Judgment.  (Docs. 78 and 80).  The County Defendants filed a reply on January 2,

2014.  (Doc. 84).  Having considered Plaintiff's Rule 56(d) affidavit, the Motion for Summary

Judgment, the accompanying briefs, and the relevant evidence of record, the Court (1) denies

Plaintiff's request for further discovery; and (2) grants the Motion for Summary Judgment in

part.  Specifically, the Court will enter summary judgment on Counts II, III, IV, V, and VII of

the First Amended Complaint (Doc. 30).

A.  *Material Facts Viewed in the Light Most Favorable to Plaintiff[1]*

Plaintiff, a member of Defendant The American Federation of State, County and

Municipal Employees Local 2516 (Local 2516) and a former Grant County Detention Center

sergeant and supervisor employed by Defendant Board of County Commissioners of Grant

County, New Mexico (County), brings this wrongful termination lawsuit against the County;

Defendant Jimenez, the administrator at the Grant County Detention Center; Defendant Saari, the

Grant County Manager; Local 2516; and Defendant The American Federation of State, County

and Municipal Employees Council #18 (Council #18), the council charged with processing

grievance cases through arbitration for Local 2516.

1.  *The Collective Bargaining Agreement (CBA)*

Under the CBA, the employer, i.e., the County, cannot discharge an employee, like

Plaintiff, "without just cause."  (Doc. 44-3) at 5.  When the employer charges an employee with

misconduct, the employer must notify the employee of the charges and conduct an internal

investigation before recommending termination of employment.  *Id.* at 5-6.  Then, the employer

---

[1] This summary of facts does not include (1) statements not clearly supported by first-hand knowledge, (2) self-serving statements, (3) conclusory statements, or (4) speculative statements. *See Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir.1995) ("To survive summary judgment, nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-supporting affidavits are not sufficient.") (quotation omitted); *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988) (to defeat summary judgment, "a party cannot rest ... on speculation, or on suspicion").

holds an informal pre-disciplinary hearing to provide the employee an opportunity to respond to the charges leading to the termination recommendation. *Id.* at 6.

If, after the pre-disciplinary hearing, the employer affirms the recommendation to terminate the employee's employment and the employee disputes that decision under the CBA, the employee must present his grievance to his "Department Head/Elected Official." *Id.* at 8. "If the employee is not satisfied with the response of the Department Head/Elected Official," the employee may file a grievance with the County Manager. *Id.* If the County Manager denies the grievance after a hearing, then the "Union President or his/her designee" may appeal the grievance to expedited arbitration within thirty days. *Id.*

 2. *Events Leading to the County's Termination of Plaintiff's Employment*

  a. *Plaintiff's January 2, 2012, Letter Regarding Operations at the Grant County Detention Center*

Plaintiff submitted a letter dated January 2, 2012, to the County's human resources department and copied it to Defendant Saari. (Doc. 44-4) at 1. Plaintiff raised "safety and security" problems at the Grant County Detention Center which Plaintiff blamed on Defendant Jimenez and the deputy administrator at the Grant County Detention Center, Joseph Andazola. *Id.* at 8-9. Neither Andazola nor Defendant Jimenez were aware of this letter until after January 13, 2012. (Doc. 44-1) at ¶ 16. Other employees at the Grant County Detention Center had also complained about Defendant Jimenez. *Id.* The County did not terminate any of those employees because of their complaints. *Id.*

  b. *Plaintiff's Informational Report on Tasing Incident*

Sometime after January 11, 2012, Plaintiff submitted an Informational Report on a reported use of force at the Grant County Detention Center. (Doc. 44-2) at 1. Plaintiff stated that on Sunday, January 8, 2012, he answered a telephone call at home from Grant County

Detention Center Officer James Salgado regarding information he received from inmate Michael Freeman on January 8, 2012, that detention center officers tased inmate Thomas Charon[2] during the graveyard shift.  *Id.*  According to the Informational Report, on January 9, 2012, Plaintiff contacted Officer Lucero about Officer Salgado's telephone call.  *Id.*  Plaintiff then stated that when he returned to work on January 11, 2012, he observed what appeared to be Taser burn marks on Charon's forearm.  *Id.*  Plaintiff further stated that on that same day he informed Lieutenant Tom Newby about the information he received regarding officers tasing Charon.  *Id.*  Plaintiff noted that the information about the tasing was also given to Defendant Jimenez.  *Id.*

### c. The Internal Investigation

In a letter dated January 13, 2012, Defendant Jimenez informed Plaintiff that Andazola was going to conduct an internal investigation into allegations that Plaintiff tased Charon.  (Doc. 44-2) at 2.  Defendant Jimenez also stated that Plaintiff would be placed on administrative leave with pay during the investigation.  *Id.*  Andazola's investigation included interviewing inmates and officers, gathering reports involving Charon, gathering the dates and times that two Tasers were discharged, and taking pictures of the alleged Taser marks on Charon.  (Doc. 78-1) at ¶ 5.

On January 19, 2012, Andazola interviewed Plaintiff about the tasing incident.  (Doc. 44-2) at 3.  A union representative was present with Plaintiff at that interview.  *Id.*  Plaintiff stated that he had been involved in past incidents with Charon when Charon was placed in a chair to calm him down.  *Id.* at 3-4.  Plaintiff also summarized his Informational Report and noted that Freeman was housed directly across the hall from Charon.  *Id.* at 4-5.  Plaintiff stated that although Charon could be annoying and disruptive, Plaintiff did not witness anyone tase Charon.  *Id.* at 4.

_____

[2] Charon was a mentally ill inmate.  (Doc. 44-2) at 2.

On January 30, 2012, Andazola interviewed Plaintiff a second time.  (Doc. 44-2) at 6.
Again, a union representative was present with Plaintiff at the interview.  *Id.*  Plaintiff admitted
at this interview that at one point he held a Taser, without a cartridge, when Charon was acting
up and agitated.  *Id.* at 6-7.  Plaintiff did not remember what day that was.  *Id.* at 6.  Plaintiff
stated that he never got "closer than seven, eight feet" from Charon.  *Id.* Plaintiff further stated
that he never went towards Charon's cell with the Taser and that he stayed at the door of the
control room.  *Id.* at 7.  Plaintiff noted that he did not show the Taser to Charon.  *Id.* Plaintiff also
stated that he did not discharge the Taser and that no other officers were present when he held
the Taser.  *Id.* Andazola, however, informed Plaintiff during the interview that inmate and officer
witnesses stated that they saw Plaintiff at Charon's cell with a Taser.  *Id.* at 8.  Later in the
interview, Plaintiff stated that he could have gone past the door of the control room with the
Taser.  *Id.* at 9.  Plaintiff then stated that he did not recall having the Taser by Charon's cell or in
the hallway, but that it was possible that he had the Taser there.  *Id.* at 10.  Plaintiff also stated
that it was possible that he discharged the Taser but he did not tase Charon.  *Id.*  Plaintiff further
intimated that he would be willing to take a polygraph examination.  *Id.*

During the course of the internal investigation, Defendant Jimenez interviewed inmate
Jacob Dabbs.  Dabbs stated that Plaintiff tased Charon on the hands and that other officers were
present.  (Doc. 78-3) at 1.  Dabbs admitted that although he was standing in the hallway, he did
not see Plaintiff tase Charon, but he saw Plaintiff with a Taser and saw him go to Charon's cell
door and push it open.  (Doc. 78-3) at 1; (Doc. 78-4) at 1.  Dabbs then heard thuds and Charon
screaming in pain.  (Doc. 78-3) at 2.  Dabbs stated that inmate Shawn Ditcher saw the tasing.  *Id.*
Dabbs also noted that Plaintiff had not been treating him well.  *Id.*

On January 31, 2012, Defendant Saari received a statement from Freeman.  Freeman stated that he did not know anything about an inmate being tased and that he said so to Andazola during two interviews.  (Doc 78-9) at 2.  Freeman also stated that he felt pressured by Andazola to say that he saw an inmate being abused.  *Id.* at 2-3.  Freeman's statements directly contradict Officer Salgado's statement in his interview with Andazola that Freeman told him that officers were tasing Charon through the food port.  (Doc. 78-11).

Notably, on September 25, 2013, after Plaintiff was finally terminated from his employment with the County, Charon attested in an affidavit that Plaintiff did not tase him. (Doc. 78-20) at ¶ 3.  In addition, Charon attested that he told Andazola sometime after January 14, 2012, that no one at the Grant County Detention Center had tased him.  *Id.* at ¶ 4.

In a memo dated February 6, 2012, Andazola submitted to Defendant Jimenez a summary of various reports concerning incidents involving Charon.  (Doc. 78-6).  Then, in a memo dated February 10, 2014, Andazola submitted to Defendant Jimenez his findings on the internal investigation.  Andazola concluded that Plaintiff did not follow the "proper procedure in the use of force…."  (Doc. 78-13) at 1.  Andazola also found that

> Inmate Charon was a mental health detainee that was not violent or hostile.  Inmate Charon was in fact tazed, there is no documentation where a tazer was on any officers person [sic] at any incident.  [Plaintiff] stated he did have a tazer in his hand, that it is possible that he was at Charon's cell with the tazer, and that it is possible that he discharged that tazer.  [Plaintiff's] inability to give an accurate and precise description of the incident is very troublesome.

*Id.*

In a letter also dated February 10, 2012, Defendant Jimenez notified Plaintiff that he recommended that Plaintiff's employment be terminated for physically abusing an inmate.  (Doc. 44-2) at 12.  Defendant Jimenez explained his recommendation as follows:

More disturbing are your conflicting statements.  Initially you didn't do anything and nothing happened however, in your second statement you eluded to having possession of the Taser and maybe you did and maybe you didn't discharge it.  There was never just cause for you having the Taser in your possession and there was never a "Planned Use of Force" and your actions are **NOT** in accordance with the Reactive Control Module that is standard for Use of Force situations.

*Id.*  Defendant Jimenez then noted that he scheduled a pre-disciplinary hearing on February 20, 2012, and advised Plaintiff of his right to union representation.  *Id.*

### d.  The February 20, 2012, Pre-Disciplinary Hearing

Present at the February 20, 2012, pre-disciplinary hearing were Defendant Jimenez, Andazola, Plaintiff, and Plaintiff's two union representatives.  Plaintiff again admitted that it was possible that he went beyond the control door with a Taser and that he went near Charon's cell door with a Taser.  (Doc. 78-16) at 2.  Plaintiff stated that he did not believe that simply having a Taser violates policy.  *Id.*  One of the union representatives also raised the issue of whether anyone had determined the date Charon was tased.  *Id.* at 4.  Plaintiff then stated that it was possible that he discharged the Taser, but he did not remember.  *Id.* at 5.  Plaintiff, nonetheless, insisted that he did not tase Charon.  *Id.*  Plaintiff further stated that he did not know why he grabbed the Taser.  *Id.*

At one point in the hearing, Plaintiff consented to Defendant Jimenez speaking to a union representative outside of his presence.  *Id.* at 6.  Defendant Jimenez told the union representative that he had physical and circumstantial evidence that Plaintiff tased Charon.  *Id.* at 7.  The union representative, however, noted that Plaintiff's possession of a Taser did not mean that Plaintiff tased Charon.  *Id.*  Defendant Jimenez apparently offered to discipline Plaintiff short of termination if Plaintiff agreed not to appeal the pre-disciplinary hearing decision.  *Id.* at 9.  The union representative rejected that offer and indicated that Plaintiff would wait for a pre-disciplinary decision and then appeal that decision.  *Id.* at 10.

7

Defendant Jimenez issued pre-disciplinary findings on February 23, 2012.  (Doc. 44-3) a

1.  Defendant Jimenez stated the following:

> Mr. Andazola conducted a fair and impartial investigation that resulted in violations of our Use of Force and Detainee Rights policy.  Then by your own admission during your hearing in front of your union representatives you admitted to employee conduct violations by displaying a Taser without provocation, maybe having [it] out near the cell, but not using it.

> During your second interview you said "I did have a Taser in my hand and it [is] possible that I did leave the area of control, it is possible that I was near Charon Cell".  Then there is the question about your recollection involving possession of the Taser.  You say incidents run together, you were frustrated and you're feeling of wanting to act out and trying to get things done was heavy on your mind.

> There was never a mention of anyone else using a Taser on Mental Health Inmate Thomas Charon.  You were in fact mentioned as having it in your hand and near the cell and you have said that yourself.  There is substantial evidence that Inmate Charon was tased.  The fact that he was a mental health inmate and could not speak for himself makes him an easy target for abuse.  His action never posed a threat to you or other staff.  As a supervisor with your training and experience we expect that you would have a more accurate and substantial recollection of your actions.

*Id.* at 1-2.  Defendant Jimenez then recommended termination of Plaintiff's employment.  *Id.* at

2.  Plaintiff acknowledged receiving the pre-disciplinary hearing findings on February 23, 2012.

(Doc. 78-7).  Plaintiff also received the internal investigation documents on that same day.  (Doc.

78-1) at ¶ 6.  Plaintiff subsequently declined to take a polygraph examination.  (Doc. 78-5).

> ### e.  The March 6, 2012, Grievance Hearing

On February 27, 2012, Local 2516 presented to County management an official request

to grieve the termination of Plaintiff's employment.  (Doc. 44-3) at 3.  On March 6, 2012,

Defendant Saari held a hearing on the grievance.  Two union representatives were present with

Plaintiff at the hearing as well as the County attorney.  *Id.* at 9.  A union representative stated

that Plaintiff may or may not have carried a Taser past the control door, but there is no policy

against carrying a Taser.  *Id.*  The union representative further noted that the only day Plaintiff

could have been on duty during the time period when Charon was tased would have been January 4, 2012.  *Id.*  Nonetheless, the union representative observed that Plaintiff worked during the day and not on the night shift when the tasing incident purportedly occurred.  *Id.*  The County Attorney stated, however, that Dabbs provided a tip which connected Plaintiff to the Taser incident.  *Id.* at 10.  A union representative further argued that Defendant Jimenez asked an inmate leading questions about the incident, that Officer Hardesty was never interviewed, and that a date and time for the incident had not been established.  *Id.* at 11.  Plaintiff again stated that (1) he did not remember if he went past the control door with the Taser; (2) he did not tase Charon; and (3) simply carrying the Taser did not violate policy.  (Doc. 78-17) at 5-6.  Plaintiff also asserted that Defendant Jimenez may have recommended termination in retaliation for Plaintiff's January 2, 2012, letter criticizing Defendant Jimenez.  *Id.* at 8-9.  Defendant Saari noted that the internal investigation started before Defendant Jimenez was aware of that letter.  *Id.* at 9.  Defendant Saari ultimately denied the grievance and upheld Plaintiff's termination effective March 23, 2012.  (Doc. 44-3) at 3.

### f. The April 23, 2012, Post-Grievance Hearing Meeting

At the request of the union, Defendant Saari held a meeting on April 23, 2012, in which Plaintiff, his two union representatives, the County attorney, and Sergeant Olguin, a certified Taser instructor from the Silver City Police Department, attended.  (Doc. 44-1) at ¶ 11; (Doc. 44-4) at 1.  A union representative reiterated that there is was no proof that Plaintiff violated a policy and no determination of the date Charon was tasered.  (Doc. 44-4) at 1, 3.  Defendant Saari, however, focused on January 4, 2012, as a possible date for the incident.  *Id.* at 3.  The union representative further noted that an officer would have heard the Taser discharge.  *Id.*

Plaintiff admitted at the hearing that a Taser was discharged three times on January 4, 2012, a day Plaintiff was apparently at work at the Grant County Detention Center.  *Id.*  Plaintiff stated that he did not know who discharged the Taser.  *Id.*  Plaintiff further explained that he picked up the Taser to change its batteries and that he walked past the control door and down the hallway with the Taser, but he did not stop at Charon's cell.  *Id.* at 4.  Plaintiff further maintained that he did not discharge the Taser.  *Id.*  Plaintiff also complained to Defendant Saari that he should not have to prove his innocence and that the County should prove his guilt in this matter. *Id.* Following this meeting, Defendant Saari upheld the termination "[b]ased on the circumstantial evidence surrounding [Charon's] injury and the deceptive statements made by" Plaintiff.  (Doc. 44-1) at ¶ 12.

> ### g. *Request for Arbitration*

On April 9, 2012, one of Plaintiff's union representatives emailed Defendant Saari that Plaintiff had decided to take the termination decision to arbitration.  (Doc. 78-19).  On April 26, 2012, one of Plaintiff's union representatives emailed the County asking when a final decision in Plaintiff's case would be made so that the union representative could go to the arbitration committee and Council #18.  (Doc. 44-4) at 6.  The next day, Plaintiff's attorney informed Defendant Saari that Plaintiff wanted to request arbitration, but that "the union representative failed to file the grievance…."  *Id.* at 7.  In fact, the president of Local 2516 apologized to Plaintiff for missing the deadline to seek arbitration.  (Doc. 78-1) at ¶ 18.

> ### 3. *Plaintiff's Attempts to Become Re-Employed in the Corrections Field*

Plaintiff submitted job applications with the Federal Bureau of Prisons (BOP) and informed the BOP of the reason for his termination with the County.  *Id.* at ¶ 19.  The BOP has not interviewed or hired Plaintiff, but it advised Plaintiff to re-apply once this lawsuit is resolved.

*Id.* Plaintiff had also applied for approximately fifty other jobs. *Id.* "[A]ll but one of those employers [Plaintiff] solicited employment from, did not hire [Plaintiff]." *Id.* at ¶ 20.

**B. *The First Amended Complaint***

In Count I of the First Amended Complaint, Plaintiff alleges that the County breached the CBA when it terminated him without just cause. In Count II, Plaintiff alleges under 42 U.S.C. § 1983 that the County terminated Plaintiff in violation of Plaintiff's rights to procedural and substantive due process under the Fourteenth and Fifth Amendments.[3] In Counts III and IV, Plaintiff alleges Section 1983 claims against Defendants Jimenez and Saari, in their individual capacities, respectively, for (1) violating Plaintiff's rights to procedural and substantive due process under the Fourteenth and Fifth Amendments, (2) violating Plaintiff's right to liberty under due process which resulted in Plaintiff being falsely stigmatized, and (3) retaliating against him for exercising his First Amendment right to free speech. In Count V, Plaintiff alleges under Section 1983 that the County's policy and custom subjected Plaintiff to other violations of his rights to procedural and substantive due process under the Fourteenth and Fifth Amendments, and his First Amendment right to free speech. In Count VI, Plaintiff alleges that the County Defendants violated the New Mexico Whistleblower Protection Act. In Count VII, Plaintiff alleges under the New Mexico Tort Claims Act (NMTCA) that (1) the County negligently supervised Defendants Jimenez and Saari; (2) Defendant Saari negligently supervised Defendant Jimenez; and (3) the County and Defendant Saari negligently trained and retained Defendant

---

[3] Plaintiff mentions in the introductory portion of the First Amended Complaint that Count II includes "New Mexico counterpart[s]." (Doc. 30) at 2. Count II, itself, does not mention any New Mexico counterparts nor does Plaintiff argue in his response that he has any New Mexico claims under Count II. The Court, therefore, concludes that Plaintiff inadvertently referred to New Mexico counterparts in the introductory portion of the First Amended Complaint.

Jimenez. Finally, in Count VIII, Plaintiff alleges that Local 2516 and Council #18 failed to fairly represent Plaintiff by not pursuing Plaintiff's request for arbitration.

The County Defendants move for summary judgment on Counts I through VII and, therefore, seek dismissal of all of Plaintiff's claims against them. Defendants Jimenez and Saari specifically raise qualified immunity defenses for the Section 1983 claims. Plaintiff opposes the majority of the Motion for Summary Judgment.

*C. Plaintiff's Rule 56(d) Request for Additional Discovery*

"Unless dilatory or lacking in merit," the Court should "liberally" treat a Rule 56(d) request for additional discovery. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992) (internal quotation marks and citation omitted). The Tenth Circuit requires a Rule 56(d) affidavit to

> explain why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts. In this circuit, the nonmovant also must explain "how additional time will enable him to rebut movant's allegations of no genuine issue of fact."

*Id.* (citations omitted). Moreover, "[w]hile the movant's exclusive control of desired information is a factor favoring relief under Rule 56[d], it is not sufficient on its own to justify that relief, especially where the other requirements of Rule 56[d] have not been met." *Price ex rel. Price v. W. Res. Inc.*, 232 F.3d 779, 784 (10th Cir. 2000). Significantly, a non-movant may not use Rule 56(d) to conduct a "fishing expedition" nor may a non-movant invoke Rule 56(d) "solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable." *Lewis v. Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990); *Salazar v. City of Albuquerque*, 2014 WL 6065603 *17 (D.N.M.) (citing *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993)). In deciding if the non-movant has been dilatory in engaging in discovery, courts consider

(i) "the length of the pendency of the case prior to the Rule 56[(d)] request"; (ii) "whether and when plaintiff could have anticipated its need for the requested discovery"; (iii) "the previous efforts, if any, made by plaintiff to obtain the needed information either through Rule discovery or otherwise"; (iv) "the degree and nature of discovery already undertaken"; (v) "any limitations placed upon discovery previously by the trial court"; (vi) "any prior solicitations of or provisions for discovery by the trial court"; (vii) "any warning which plaintiff might have had that, absent a speedier request, discovery might be denied and his claim be dismissed"; and (viii) "whether the requested information was inaccessible to plaintiff, e .g. as when within defendant's exclusive control, or whether alternative, accessible sources existed but were foregone."

*Salazar*, 2014 WL 6065603, at *18 (quoting *Paul Kadair, Inc. v. Sony Corp. of Am.,* 694 F.2d 1017, 1031 (5th Cir.1983)). *See also Jensen*, 998 F.2d at 1555 n. 7 (noting that "Fifth Circuit enumerates eight factors to be considered in determining whether a party has been dilatory in seeking discovery" (citing *Paul Kadair, Inc*., 694 F.2d at 1031)).

Plaintiff describes the discovery he would like to engage in and how that discovery is relevant to his claims against the County Defendants.  Plaintiff, however, does not identify "the probable facts not available" nor does he explain what steps, if any, he has taken to obtain the discovery he allegedly needs.  Instead, Plaintiff's affidavit appears to be a fishing expedition for facts which may or may not aid him in opposing the Motion for Summary Judgment. Additionally, Plaintiff had an opportunity to engage in discovery from January 16, 2013, through November 13, 2013.  (Docs. 15 and 54)  There is no reason to believe that Plaintiff could not have anticipated his need for discovery prior to the filing of the Motion for Summary Judgment or that previous discovery was somehow limited.  In fact, Plaintiff does not describe the degree and nature of the discovery already undertaken by the parties.  Plaintiff further does not indicate that he could not access alternative sources for the information he seeks.  Plaintiff's request for additional discovery under Rule 56(d) both lacks merit and is dilatory.  Hence, the Court denies Plaintiff's request for additional discovery.

D.  *Standard of Review*

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).[4]  When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact.  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted).

When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor."  *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).  Unlike other affirmative defenses, the plaintiff bears the burden of overcoming the defense of qualified immunity.  *Id*.  At the summary judgment stage, the Court "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct."  *Id.* The Court may in its discretion decide which of the two-parts of the qualified immunity test to address first.  *Id.* at 412.

---

[4]Rule 56 was amended effective December 1, 2010, but the standard for granting summary judgment remains unchanged.

"In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'"  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  "[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  The plaintiff, however, "is not required to show that the very conduct in question has previously been held unlawful."  *Sh. A. ex rel. J. A. v. Tucumcari Mun. Schools*, 321 F.3d 1285, 1287 (10th Cir. 2003). The plaintiff is

> required to demonstrate the unlawfulness was "apparent" in light of established law. Generally, this requires that the plaintiff demonstrate a "substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited."

*Id.* (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255-56 (10th Cir. 1998)).  Once the Court concludes that a right was "clearly established," then it becomes the "defendant's burden to prove that her conduct was nonetheless objectively reasonable."  *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (citation omitted).  Whether a defendant's conduct is objectively reasonable is a legal question while a factual question may arise when there are disputes regarding the historical facts material to the objectively reasonable issue.  *Id.*

E. *Discussion*

1. *Count I:  The Breach of Contract Claim Against the County*

The County argues that Plaintiff cannot maintain a breach of contract claim based on the CBA because he did not exhaust the CBA's grievance procedure.  Plaintiff contends that Count I

15

is a hybrid cause of action under the Labor Management Relations Act of 1947 (LMRA), Section 301, codified at 29 U.S.C. § 1985.  Under the LMRA, an employee cannot sue an employer for breach of a CBA until the employee exhausts the grievance procedure provided under the CBA, but an employee need not exhaust the CBA grievance procedure if the union "breached its duty of fair representation in its handling of the employee's grievance." *Vaca v. Sipes*, 386 U.S. 171, 184-86 (1967).  A breach of the duty of fair representation occurs when the union actions were "'arbitrary, discriminatory, or in bad faith.'"  *Rivera v. Bernalillo County*, 51 Fed. Appx. 828, 831 (10th Cir. 2002) (citation omitted).  Although "'[m]ere negligence, poor judgment, or ineptitude'" do not establish a breach of the duty of fair representation, the Tenth Circuit has also held that a jury could find that a perfunctory handling of a claim resulting in failing to meet a deadline is an arbitrary action which, therefore, allows the employee to proceed with his breach of contract claim without exhausting the grievance procedure.  *Id.* (citation omitted); *Foust v. Int'l Bhd. of Elec. Workers*, 572 F.2d 710, 716 (10th Cir. 1978), *rev'd in part on other grounds*, 442 U.S. 42 (1979).

Here, Plaintiff alleges that he was unable to exhaust the CBA's grievance procedures on the issue of the alleged breach of the CBA because the "Union President or his/her designee" did not appeal his grievance to expedited arbitration as Plaintiff requested.  Plaintiff maintains that the union's failure to proceed to arbitration was arbitrary and, therefore, a breach of the union's duty of fair representation.  The County argues, on the other hand, that the failure to appeal the grievance to expedited arbitration constituted mere negligence.  The County, however, does not address Tenth Circuit precedence which suggests that a jury could find that a perfunctory handling of a claim, which appears to be the case here, constitutes an arbitrary action.  Because there is a question of fact regarding whether Plaintiff should be excused from the exhaustion

requirement, summary judgment on Count I is inappropriate.

> 2. *Count II: The Section 1983 Due Process Claims Against the County*

Next, the County argues that the County cannot be liable under Section 1983 because Plaintiff has not come forward with evidence that a County policy was the moving force behind Plaintiff's termination of employment or that a final policymaker for the County made the decision to terminate Plaintiff's employment. *See, e.g., Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007) ("a municipality is responsible for *both* actions taken by subordinate employees in conformance with preexisting official policies or customs *and* actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality."). Plaintiff, in fact, seems to concede that there is no "unconstitutional policy" at issue in this case. (Doc. 78) at 22. On the other hand, Plaintiff appears to assert that Defendants Jimenez and Saari were final policymakers. Yet, Plaintiff does not provide any factual support for that assertion. Plaintiff actually stated in a brief that Defendant Saari was "not the final decision maker…." (Doc. 64) at 36. Plaintiff has failed to rebut the County's argument that it is entitled to summary judgment, as a matter of law, on Count II. The County is, therefore, entitled to summary judgment on Count II and Count II will, therefore, be dismissed with prejudice.

> 3. *Counts III and IV: The Section 1983 Claims Against Defendants Jimenez and Saari in their Individual Capacities*

Defendants Jimenez and Saari argue that Plaintiff cannot show that they violated Plaintiff's rights to procedural and substantive due process or that they retaliated against Plaintiff in violation of the First Amendment. Consequently, Defendants Jimenez and Saari contend that they are entitled to qualified immunity on Counts III and IV, respectively.

> a. *Procedural Due Process*

17

Plaintiff contends that Defendant Jimenez's pre-disciplinary hearing was inadequate and simply ratified an inadequate internal investigation. *See* (Doc. 78) at 23. Plaintiff also contends that Defendant Saari, in turn, ratified the inadequate investigation and failed to provide Plaintiff with post-termination due process. *Id.* To determine whether an individual denied an employee procedural due process, courts engage in a two-step inquiry: (1) does the employee have an interest protected by due process; and (2) was the employee given an appropriate level of process. *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009). Defendants Jimenez and Saari do not dispute that Plaintiff had a protected interest in his employment. (Doc. 44) at 13. Instead, Defendants Jimenez and Saari argue that Plaintiff received an appropriate level of process

In an employment termination situation, procedural due process requires that an employee receive a pre-termination hearing. *Riggins*, 572 F.3d at 1108. That hearing need not be a full evidentiary hearing and can be informal in nature. *Id.* Such a hearing requires only (1) notice to the employee of the charges against him, (2) an explanation of the employer's evidence supporting the charges, and (3) an opportunity for the employee to respond to the charges. *Id.* When an employee has an adequate post-termination remedy available, due process does not require an "extensive or formal pre-termination hearing" or even an impartial hearing officer. *Herrera v. City of Albuquerque*, 198 F.3d 258 *2 (10th Cir. 1999); *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998). Moreover, CBA grievance procedures "satisfy an employee's entitlement to post-termination due process." *Herrera*, 198 F.3d at *2.

It is undisputed that in a letter dated January 13, 2012, Defendant Jimenez informed Plaintiff that Andazola was going to conduct an internal investigation regarding Plaintiff tasing a mentally ill inmate. (Doc. 44-2) at 2. It is clear from Andazola's subsequent interviews of

Plaintiff that the internal investigation concerned Charon.  (Doc. 44-2) at 3-11.  Plaintiff also had

a union representative with him at both interviews conducted by Andazola.  Then, in a letter

dated February 10, 2012, Defendant Jimenez informed Plaintiff of the charges against him,

explained why he was recommending termination, advised Plaintiff to contact his union

representative, and scheduled a pre-disciplinary hearing.  (Doc. 44-2) at 12.  At the February 20,

2012, pre-disciplinary hearing, Plaintiff had two union representatives with him and had an

opportunity to address the charges against him.  The next day, the County attorney provided

Plaintiff's union representative with a copy of Freeman's exculpatory January 31, 2012,

statement.  (Doc. 78-9).  On February 23, 2012, Plaintiff received the documents Andazola

collected during his internal investigation as well as Defendant Jimenez's findings and

explanation for his termination recommendation.  (Doc. 44-3) at 1-2; (Doc. 78-1) at ¶ 6; (Doc.

78-7).  Plaintiff then appealed Defendant Jimenez's recommendation to Defendant Saari who

also held two pre-termination hearings before finally deciding to terminate Plaintiff.  At both of

those hearings, Plaintiff had union representation and an opportunity to present his side of the

story.  Finally, although Defendant Saari denied Plaintiff's request for arbitration because the

union representative failed to file a timely grievance to proceed to arbitration, the CBA provided

a post-termination process which Plaintiff does not dispute is adequate.  *See* (Doc. 44-4) at 7.

Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could not find

that Plaintiff received an inappropriate level of process from both Defendants Jimenez and Saari

with respect to Plaintiff's pre-termination hearings.  In addition, Defendant Saari acted

objectively reasonably when he denied the request for arbitration based on the union's failure to

comply with the CBA.  In sum, Defendants Jimenez and Saari are entitled to qualified immunity

on the procedural due process claims and those claims will be dismissed with prejudice.

### b. *Substantive Due Process*

Next, Defendants Jimenez and Saari correctly argue that it is not clearly established whether substantive due process protects "a tenured employee's property interest in continued employment…." *Herrera*, 198 F.3d at *2. Defendants Jimenez and Saari are, therefore, entitled to qualified immunity on the substantive due process claims and those claims will be dismissed with prejudice. *See, e.g., Hixson v. Alameda County Sheriff's Dep't*, 10 Fed. Appx. 489, 490 (9th Cir. 2001) ("Because the law in this Circuit has not clearly established a substantive due process claim for arbitrary discharge from public employment, we agree with the district court that Sheriff Plummer is entitled to qualified immunity.").

### c. *Due Process Liberty Interest*

Defendants Jimenez and Saari also contend that they are entitled to qualified immunity on the due process liberty interest claim. Plaintiff specifically alleges that Defendants Jimenez and Saari violated his liberty interest in the course of terminating Plaintiff because the termination of employment caused Plaintiff to be stigmatized and thereby damaged his reputation. (Doc. 30) at 21. Plaintiff further alleges that the basis for the termination was "made public by virtue of filing this lawsuit" and that he "was not allowed a public hearing to clear his name…." *Id.*

Defendants Jimenez and Saari correctly argue that the filing of this lawsuit cannot be a basis for a liberty interest claim. *See Diehl v. Albany County School Dist. No. 1*, 694 F.Supp. 1534, 1536 (D. Wyo. 1988) ("In making his liberty interest claim, plaintiff may not rely on statements arising from this lawsuit."). Nonetheless, a liberal reading of the First Amended Complaint reveals that the grounds for Plaintiff's termination of employment is the basis for Plaintiff's liberty interest claim. The Court will, therefore, focus on that aspect of Plaintiff's

claim.

> In the Tenth Circuit, a plaintiff alleging a liberty interest claim must meet four factors:

> [f]irst … the statements must impugn the good name, reputation, honor, or integrity of the employee.  Second, the statements must be false.  Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities.  And fourth, the statements must be published.  These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest.

*Evers v. Regents of Univ. of Colo.*, 509 F.3d 1304, 1308 (10th Cir. 2007) (quoting *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994) (citations omitted)).  The Tenth Circuit has interpreted the third element to require both proof "that the statements occurred in the course of terminating the employee and that they foreclosed other employment opportunities."  *Salazar v. City of Albuquerque*, 2014 WL 6065603, *21 (D.N.M.) (citing *Guttman v. Khalsa*, 669 F.3d 1101, 1126 (10th Cir. 2012)).

It is also well-established that a liberty interest claim implicates procedural due process and raises due process concerns "only when the subject of the stigmatizing statement is denied a hearing to clear his or her name."  *Id.* at *22.  There are three ways to satisfy the due process requirements of a name clearing hearing:

> [by] (i) providing the employee with a pre-termination hearing that is not a full evidentiary hearing but is followed post-termination by a full trial type evidentiary hearing; (ii) providing the employee only with a full trial type evidentiary hearing post-termination; and (iii) providing the employee only with a pretermination hearing that satisfies the requirements for a full trial type evidentiary hearing.

*Voccola v. Gaudett*, 861 F. Supp. 2d 52, 56 (D. Conn. 2012) (citations omitted).  Affording an opportunity for an arbitration hearing pursuant to a CBA, likewise, can satisfy the due process requirement for a name-clearing hearing.  *See McDonald v. Wise*, 769 F.3d 1202, 1214 (10th Cir. 2014) (citing *Komlosi v. N. Y. State Office of Mental Retardation & Developmental Disabilities*, 64 F.3d 810, 817-18 (2d Cir. 1995)).  If, however, a defendant prevents a plaintiff from pursuing

an arbitration hearing, then the plaintiff may have a liberty interest claim.  *Miller v. City of Ithaca*, 2010 WL 3809842 *12 (N.D. N.Y.).

Viewing the evidence in the light most favorable to Plaintiff, a jury could find that Plaintiff meets the first three elements of a liberty interest claim.  Moreover, information contained in documents maintained by an employer "may be deemed published if there is a likelihood that the information will be disclosed to prospective employers."  *Sanchez v. Dubois*, 291 Fed. Appx. 187, 191 (10th Cir. 2008).  A reasonable jury could, therefore, find that Plaintiff meets the final publication element as well.

Defendants Jimenez and Saari, nonetheless, argue that Plaintiff's liberty interest claim fails because he did not seek a name-clearing hearing from either Defendants Jimenez or Saari. In this instance, a reasonable jury could find that Plaintiff did not ask Defendants Jimenez or Saari for a name-clearing hearing prior to his termination and that the pre-termination hearings were not full evidentiary hearings that could be deemed name-clearing hearings.  Yet, Plaintiff's attorney explicitly asked Defendant Saari for arbitration under the CBA following Plaintiff's termination of employment.  A reasonable jury could find that this request for arbitration was a request, in effect, for a name-clearing hearing and that Defendant Saari denied that request. Defendant Saari's refusal to grant the request for arbitration was, nevertheless, objectively reasonable because the union did not timely make such a request under the CBA.  Defendant Saari is, therefore, entitled to qualified immunity on the liberty claim.  Because Defendant Jimenez was not involved in the decision to deny the request for arbitration, he is also entitled to qualified immunity on the liberty interest claim.

### d. First Amendment Free Speech

Defendants Jimenez and Saari further argue that they are entitled to qualified immunity on the First Amendment free speech claim.  Plaintiff alleges that his January 2, 2012, letter complaining about Defendant Jimenez's ability to operate the Grant County Detention Center "was a motivating factor in the Plaintiff being targeted for investigation and falsely accused of tasing Charon and then being terminated from employment from the detention center he had just a week or so earlier had complained to superiors about."  (Doc. 30) at ¶ 76c.  *See also* (Doc. 30) at ¶ 82c.

Defendants Jimenez and Saari contend that Plaintiff's letter does not, as a matter of law, constitute speech protected by the First Amendment because it was made pursuant to Plaintiff's official duties as a sergeant and supervisor.  *See Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (first element of test governing First Amendment retaliation claim is  "whether the speech was made pursuant to an employee's official duties;" this element is issue of law for court to decide).  The Tenth Circuit "take[s] a broad view" of what speech falls within official duties by generally asking if the speech "involves the type of activities that the employee was paid to do."  *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (quotation omitted).  The Tenth Circuit has also explained that it "has not foreclosed unauthorized speech or speech 'not explicitly required as part of [an employee's] day-to-day job' from being within the scope of that employee's official duties…."  *Rohrbough v. Univ. of Colorado Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010) (citations omitted).  Moreover, "speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties…."  *Id.*

In this case, Plaintiff wrote the January 2, 2012, letter in his capacity as sergeant and

presumably, as a supervisor.  Plaintiff addressed the letter to "Human Resources" as well as to the County Manager.  This action demonstrates that Plaintiff directed the letter to his chain of command.  Notably, Plaintiff did not disclose the letter to the public.  In addition, Plaintiff wrote about "safety and security issues" at the Grant County Detention Center, matters within the scope of Plaintiff's duties as a sergeant and supervisor at the Grant County Detention Center. The Court, therefore, concludes that Plaintiff wrote the January 2, 2012, letter pursuant to his official duties.  Consequently, the First Amendment does not protect the speech in that letter and Defendants Jimenez and Saari are entitled to qualified immunity on the First Amendment free speech claim.  In sum, the Court will grant summary judgment in favor of Defendants Jimenez and Saari on Counts III and IV, respectively.

### 4.  Count V:  Additional Constitutional Claims Against the County

As with Count II, the County argues that summary judgment should be granted as to Count V because Plaintiff has not come forward with evidence that a County policy was the moving force behind the alleged constitutional violations or that a final policymaker for the County violated any of Plaintiff's constitutional rights.  In fact, Plaintiff does not dispute that argument nor does he provide any evidence to oppose the argument.  Like Count II, a reasonable jury could not find that Count V has merit.  Accordingly, the County is entitled to summary judgment on Count V.

### 5.  Count VI:  The Whistleblower Claims

The County Defendants assert two reasons for granting summary judgment on Count VI. First, the County Defendants contend that Section 301 of the LMRA preempts the Whistleblower claims.  Second, the County Defendants contend that Plaintiff has not made a *prima facie* case of retaliation under the New Mexico Whistleblower Protection Act.

24

a. *Preemption*

The purpose of Section 301 is to address disputes arising from CBAs. *Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1152 (10th Cir. 2005).  Section 301, therefore, preempts state law claims which rely on interpretations of CBA provisions. *Id.*  In other words, preemption arises only when the state law claim "is *inextricably intertwined* with consideration of the terms of the" CBA. *Id.* (internal quotation marks and citation omitted).  If the state law claim can be resolved without interpreting the CBA, then the state law claim is not subject to preemption. *Id.*

To be entitled to relief under the New Mexico Whistleblower Protection Act, Plaintiff must show that a public employer[5] retaliated against him for communicating "information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act…." 1978 NMSA, § 10-16C-3(A) (2012 Cum. Supp.).  Defendants can defend against an alleged violation of the New Mexico Whistleblower Protection Act by showing that their actions against Plaintiff were due to a "legitimate business purpose unrelated to conduct prohibited pursuant to the Whistleblower Protection Act and that retaliatory action was not a motivating factor."  1978 NMSA, § 10-16C-4(B) (2012 Cum. Supp.).

In this instance, Plaintiff alleges that the County Defendants' termination of his employment was in retaliation for his January 2, 2012, letter criticizing how Defendant Jimenez operated the Grant County Detention Center.  The County Defendants claim that they terminated Plaintiff for just cause as required under the CBA.  None of the parties dispute the meaning of "just cause."  Rather, the issue is whether the County Defendants applied the just cause standard

_____

[5] Although the County Defendants raise a question as to whether Defendant Jimenez can be considered a "public employer," neither the County Defendants nor Plaintiff fully address that question. *See Janet v. Marshall*, 2013–NMCA–037, 296 P.3d 1253, *cert. granted*, No. 34,006. In that situation, the Court is not required to make the arguments for the parties. *See Perry v. Woodward,* 199 F.3d 1126, 1141 n. 13 (10th Cir.1999) ("This court ... will not craft a party's arguments for him.").

when it terminated Plaintiff from his employment.  Because the Whistleblower claims can be resolved without interpreting the CBA, Section 301 does not preempt those claims.  *See Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) ("when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claims be extinguished.").

> b.  *Showing a Whistleblower Claim*

Due to a lack of case law addressing the process for bringing a Whistleblower claim in New Mexico, the Court assumes, as do the parties, that New Mexico courts would apply the *McDonnell Douglas* burden shifting scheme to a Whistleblower claim, a scheme already adopted by New Mexico courts to analyze similar retaliation claims under the New Mexico Human Rights Act.  Under *McDonnell Douglas*,

> an employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inadequate.

*Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 9, 139 N.M. 12 (citations omitted).  To establish a *prima facie* case for retaliation, a "plaintiff must prove:  (1) she engaged in a protected activity, (2) she was subject to adverse employment action, and (3) a causal connection exited between the protected activity and the adverse employment action."  *Gonzales v. New Mexico Dep't of Health*, 2000-NMSC-029, ¶ 22, 129 N.M. 586.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff established a *prima facie* case of retaliation based on his January 2, 2012, letter. Although other employees who complained about Defendant Jimenez were not terminated from employment, viewing the quality of the evidence against Plaintiff in the light most favorable to

Plaintiff, a reasonable jury could find that the County Defendants failed to demonstrate a legitimate business reason for their termination of Plaintiff's employment.  Hence, Count VI survives this Motion for Summary Judgment.

      *6.  Count VII:  The NMTCA Claims Against the County and Defendant Saari*

      The County and Defendant Saari argue that the NMTCA does not provide any waiver of sovereign immunity for the NMTCA negligent supervision, training, and retention claims. Plaintiff clarifies in his response that he bases his NMTCA claims on the waiver of sovereign immunity provided for in NMSA 1978, § 41-4-6(A) (2012 Cum. Supp.).  Section 41-4-6(A) states that sovereign immunity is waived for "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building…."  The New Mexico Supreme Court broadly interprets Section 41-4-6(A) "to waive immunity 'where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government.'"  *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 10, 310 P.3d 611 (quoting *Castillo v. Cnty. of Santa Fe,* 1988–NMSC–037, ¶ 3, 107 N.M. 204).

      Plaintiff contends that Section 41-4-6(A) applies because his termination of employment arose from an inadequate investigation of the alleged tasing of Charon.  (Doc. 78) at 32.  A reasonable jury, however, could not find that Plaintiff's termination of employment arose from an unsafe, dangerous, or defective condition at the Grant County Detention Center. Consequently, Plaintiff has failed to show that Section 41-4-6(A) waives sovereign immunity for his Count VI claims.  *See Tapia v. City of Albuquerque,* 10 F.Supp.3d 1207, 1319 (D.N.M. 2014) ("As the City Defendants note, '[t]he complaint does not identify any waiver of immunity for

negligence for defendants for terminating plaintiffs."' (citations omitted)).  Count VI is, therefore, subject to summary judgment and will be dismissed with prejudice.

*F.  Conclusion*

The Court denies Plaintiff's Rule 56(d) request for additional discovery to respond to the Motion for Summary Judgment.  The Court will also deny summary judgment on Counts I and VI.  However, the Court will grant summary judgment on Counts II, III, IV, V, and VII.

IT IS ORDERED that

1.  Plaintiff's Rule 56(d) request for additional discovery is denied;

2.  Defendants' Motion for Summary Judgment (Doc. 44) is granted in part;

3.  summary judgment will be entered in favor of the County on Counts II and V of the First Amended Complaint;

4.  summary judgment will be entered in favor of Defendant Jimenez on Count III of the First Amended Complaint;

5.  summary judgment will be entered in favor of Defendant Saari on Count IV of the First Amended Complaint;

6.  summary judgment will be in favor of the County and Defendant Saari on Count VII of the First Amended Complaint; and

7.  Counts II, III, IV, V, and VII of the First Amended Complaint will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

28